FILED
11/15/2021
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
October 12, 2021 Session

## IN RE DANIEL G.

**Appeal from the Chancery Court for Monroe County**
**No. 20,376    Jerri S. Bryant, Chancellor**

_____

## No. E2021-00188-COA-R3-PT

_____

The paternal grandparents, William G. ("Grandfather") and Samantha G. ("Grandmother"), filed a petition for adoption and to terminate the parental rights of the mother, Misty K. ("Mother"), to the minor child, Daniel G. ("the Child"), in the Monroe County Chancery Court (the "Trial Court"). The Trial Court found that Petitioners had proven by clear and convincing evidence that the grounds of abandonment by failure to support, persistent conditions, and severe child abuse existed for termination of Mother's parental rights. The Trial Court further found that termination of Mother's parental rights was in the Child's best interest. We vacate the statutory ground of persistent conditions due to insufficient findings of fact. However, we affirm the Trial Court's judgment in all other respects, including the termination of Mother's parental rights.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KRISTI M. DAVIS, JJ., joined.

Judith A. Hamilton, Athens, Tennessee, for the appellant, Misty K.

Clifford E. Wilson, Madisonville, Tennessee, for the appellees, William G. and Samantha G.

# OPINION

## Background

Prior to the Child's birth, Mother pled guilty to attempting to manufacture methamphetamine, reckless endangerment, and two counts of child abuse and neglect in May 2005. Concerning the events that led to these convictions, Mother testified at trial to living in the home with Ian L., her boyfriend at the time, and her two children in 2004 when the home was raided by police. Mother acknowledged that law enforcement found a meth lab in her home. She denied making methamphetamine herself and stated as follows: "No, sir, I didn't know how to make meth until I had done been charged with it. And then I thought since I've been charged with it, I might as well learn how to do it. That's when I learned how to do it is after I was charged. I didn't know until then, no, sir." She denied allowing her children to stay in a home with a meth lab and stated that she was unaware her boyfriend was manufacturing methamphetamine in the home. According to Mother, she pled guilty in court because she was scared and was unaware that she could fight the charges and win. One of Mother's older children, Chris K., who lived in Mother's home at this time, testified at trial and denied knowing that a meth lab was present in the home.

Officer Jeb Brown, former narcotics agent with the Monroe County Sheriff's Department, testified about the incident in 2004. He testified that there was a very strong smell of methamphetamine in Mother's home that typically accompanied the manufacture of methamphetamine in those days. He also testified that they found components to make methamphetamine within the home. He stated that the components were visible to anyone living in the home and, for the most part, were not hidden. Officer Brown testified that Mother was not present in the home when they arrived but pulled up while they were at the home. He stated that Mother did not come inside the home but left when she saw law enforcement present. Another officer was sent after Mother and they stopped her down the road. According to Officer Brown, they did not actually see the children inside the residence on the day they were at the home. The minor child at issue in this case, Daniel G., was born in 2010. The minor children living with Mother in 2004 are half-siblings of the Child.

In September 2011, Mother was found guilty of shoplifting and received a suspended sentence. In November 2011, Officer Daniel Johnson, a police officer with the Sweetwater Police Department, had an interaction with Mother. Mother was cooperative with him. During his investigation at Fred's Discount Store, Mother admitted to him that she had been shoplifting and showed him several items she had taken. With Mother's permission, he retrieved other items from her purse. At this time, Mother had the Child, who was about one year old, with her. Officer Johnson requested to search Mother's purse, and he found coffee filters. Mother informed Officer Johnson that the coffee filters were used in the process of making methamphetamine. Officer Johnson also found methamphetamine in her purse. Mother was arrested and ultimately pled guilty in May

2012 to possession of methamphetamine, theft of less than $500, and possession of a weapon by a convicted felon. Officer Johnson contacted the Tennessee Department of Children's Services ("DCS") regarding the Child, who was in Mother's care at the time of her arrest.

DCS filed a petition to transfer legal custody of the Child to the paternal grandparents, William G. and Samantha G. (collectively, "Petitioners"), in November 2011. The petition included allegations regarding Mother's arrest, as well as a drug screen she failed for amphetamine, benzodiazepines, methadone, methamphetamine, opiates, oxycodone, PCP, and THC. The Monroe County Juvenile Court entered a protective custody order the same day, placing custody of the Child with Petitioners. The juvenile court conducted an adjudicatory hearing in January 2012 and entered an order, finding that Mother had waived her right to an adjudicatory hearing and had stipulated that the facts in the dependency and neglect petition were true. The juvenile court, therefore, found by clear and convincing evidence that the Child was dependent and neglected.

A judicial review was conducted in February 2012 and the juvenile court entered an order finding that Mother was enrolled in an out-of-state, in-patient drug treatment. The juvenile court, therefore, granted a continuance of the review hearing at Mother's request. Following a hearing in May 2012, the juvenile court entered an order finding that Mother had completed in-patient drug rehabilitation treatment and scheduling another review hearing. This review hearing was continued at Mother's request, with the review hearing to be scheduled at a later date by agreement of the parties. In September 2012, Mother pled guilty to possession of synthetic cannabinoids and was sentenced to ninety days supervised probation.

In February 2013, Mother filed a motion requesting unsupervised visitation with the Child. The juvenile court subsequently entered an order, requiring DCS to conduct a home study of Mother's home with random drug screening. As part of the home study, Mother failed a drug screen for oxycodone in June 2013. The juvenile court thereafter entered an order, requiring Mother to provide the court with drug screens on a monthly basis and ordering that Mother's visitation be supervised every Friday from 10:00 a.m. until 6:00 p.m. In July 2013, Mother pled guilty to simple possession of a schedule VI drug.

In May 2014, Mother filed a petition, asking the juvenile court to allow her unsupervised, overnight visitation with the Child. Her petition stated that she had attended rehab in September 2013. The juvenile court entered an order, finding that it was in the Child's best interest to receive additional visitation with Mother. According to the order, Mother was to receive unsupervised, overnight visitation with the Child one weekend per month and an additional supervised visit on the fourth weekend of each month.

Mother filed another petition in September 2014 regarding the visitation ordered by the court. The juvenile court entered an order recognizing that Mother had expressed

confusion over the court's previous order. The juvenile court then clarified its order specifying that Mother would receive unsupervised, overnight visitation during the second weekend of each month and supervised visitation during the fourth weekend of the month. The juvenile court clarified the schedule but denied further expansion of visitation.

Mother filed a motion requesting a summer visit with the Child, which was heard on June 24, 2015. Drug test results from drug testing conducted on May 14, 2015 and June 16, 2015 are in the record and reflect that Mother was negative for all substances. The juvenile court subsequently entered an order requiring Mother to submit to a drug screen on July 10, 2015, and if she passed the drug test, she would be permitted to take the Child on vacation out of state. The juvenile court further ordered that the maternal grandmother and great-grandmother would supervise this vacation visit. Testimony during trial established that Mother passed this drug screen. However, Grandmother testified during trial that the maternal grandmother became ill and that instead of the ordered supervised visitation in Florida, Mother took the child camping on her own. According to Grandmother, she did not know about this ahead of time.

In December 2015, Mother pled guilty to driving under the influence, possession of methamphetamine, and possession of marijuana. In May 2016, Mother filed another motion requesting summer visits with the Child. The record includes a drug screen performed by DCS at Mother's request on June 30, 2016, wherein Mother tested negative for all substances. Following a hearing on Mother's motion, the juvenile court entered an order, stating that the "conditions for Mother at this time do not support [an] increase in visitation." This order required Mother to complete an alcohol and drug assessment and follow the recommendations therefrom. The juvenile court further ordered that Mother would continue supervised visitation as was previously ordered.

This matter was reviewed before the juvenile court in September 2016, at which time the juvenile court entered an order finding that Mother failed a court-administered drug screen. The record includes drug screen results conducted by the juvenile court, wherein Mother tested positive for methamphetamine. The juvenile court ordered that Mother submit to a nail bed drug test and that all visitation with Mother would be supervised and not overnight. During trial, Mother explained that she went to comply with the test but her fingernails were too short, and due to a "nervous habit," she was unable to let them grow out. Mother pled guilty to a violation of her probation in December 2016 and was ordered to remain on probation for an additional eleven months and twenty-nine days.

Mother filed a motion for summer visits in May 2017, but it was never heard by the court. A motion for status was filed later by the guardian *ad litem*. A status hearing was conducted in October 2017 before the juvenile court, and Mother did not appear. According to Mother, she was unaware of the court date until it was over and her adult daughter had been in labor that day. On cross-examination, Mother acknowledged that she

had been given a citation at 4:00 a.m. that morning to appear in court on another date after being found in possession of marijuana. The juvenile court subsequently entered an order stating that Mother's visitation with the Child would be as follows:

> [Mother] shall be allowed reasonable visitation with the child, but no overnight visitation. The custodians or their designee shall supervise all visitation and shall terminate the visitation at any time they feel it is harmful to the child or not in his best interests. The custodians shall determine the time and duration of all visitation.

The juvenile court then closed its case, leaving custody of the Child with Petitioners.

Mother testified that she saw the Child once a week prior to this October 2017 court date but that her visitation immediately changed to four hours a month after this date. Mother acknowledged that when she received a copy of the order from the October 2017 hearing, she did nothing about it. Grandmother testified that she continued giving visitation to Mother for a while but those visits were stopped in June 2018. Grandmother testified that she was afraid Mother was going to grab the Child and leave. According to Grandmother, the Child had informed her that Mother told the Child to be ready to jump out the window of the home when she came to the house so the Child could run away with Mother. There also was an incident that occurred in August 2018 in Petitioners' driveway when Mother came to their home, opened the car door, grabbed the Child, and gave him a note.

Mother was found guilty of theft in December 2017. Mother was found guilty of simple possession of marijuana in April 2018 and was sentenced to supervised probation for eleven months and twenty-nine days. Grandmother testified that she mailed a copy of a letter to Mother in May 2018, via certified mail, requesting Mother to sign over her parental rights to Petitioners. The document, which was made an exhibit at trial, appears to be an adoption petition with a blank signature line for Mother. Frankie T., the maternal great-grandmother, signed the return receipt for the certified mail in May 2018. According to Frankie T., she gave the letter to Mother and Mother "went and filed against it." Mother subsequently filed a petition to modify parenting time in June 2018, alleging she had not been allowed any parenting time, that a material change in circumstances had occurred, and that the circumstances which led to the Child's removal from her custody had abated.

On July 19, 2018, Petitioners filed a petition to terminate Mother's parental rights and to adopt the Child in the Trial Court, alleging as grounds for termination that Mother had abandoned the Child by failing to support him financially and failing to visit him. Mother was served with a copy of the petition and filed a document stating, "No They Can't Adopt [the Child]." Mother subsequently filed an answer to the termination petition in September 2018, denying that grounds existed to terminate her parental rights and that it was in the Child's best interest for her rights to be terminated. Mother further alleged in

her answer that Petitioners had not stated a claim for which relief could be granted and that Mother's actions of failing to support and visit the Child were not willful.

Following a motion by Petitioners, the Trial Court entered a temporary restraining order prohibiting Mother from contacting Petitioners and the Child pending a hearing on the matter. The allegations in the motion included an incident that occurred in the driveway of Petitioners' home in August 2018. Mother filed a response to Petitioners' motion for a restraining order denying the allegations and a counter-motion requesting reasonable parenting time with the Child. In January 2019, the Trial Court entered an order allowing Mother to have visitation with the Child through Solomon Family Solutions for two hours per week and instructing Mother not to talk about the case or inappropriate matters with the Child. The Trial Court expressed concern over the actions of Mother in the driveway but stated it was reasonable for Mother to be upset by not seeing the Child. The Trial Court ordered that Mother's supervised visits would be suspended if Mother talked about inappropriate matters during the visits. Mother acknowledged that in January 2019, Mother agreed during a deposition to participating in a "10-Panel Nail Bed Test" and to providing Petitioners with a copy of that test. She further admitted that she had not done so.

In March 2019, Mother's probation was revoked, reinstated, and extended for a period of eleven months and twenty-nine days. Also on that date, Mother pled guilty to shoplifting, simple possession of Clonazepam, and simple possession of marijuana and was sentenced to supervised probation for eleven months and twenty-nine days to run concurrently with each other but consecutive to the April 2018 sentence. The Child's guardian *ad litem* subsequently filed a motion to suspend Mother's supervised visitation due to her recent convictions. In April 2019, the Trial Court ordered Mother to submit to a nail bed drug test sufficient to detect Clonazepam and temporarily suspended Mother's supervised visitation until the nail bed drug testing was complete. Mother acknowledged during trial that she had not completed the nail bed drug screen and explained that she scheduled the test but was arrested before she could attend the appointment.

Mother received another violation of her probation in May 2019. As a result of this violation, Mother was sentenced to incarceration for eleven months and twenty-nine days at 50% in the Monroe County Jail. On the same day, Mother pled guilty to one count of simple possession of methamphetamine and one count of simple possession of marijuana and was sentenced to serve eleven months and twenty-nine days at 75%.

In June 2019, Mother was furloughed from jail to attend a program called Women at the Well. While Mother was at the facility, she became sick and was transferred to the hospital for nine days. Mother testified that when she was released from the hospital, she was on furlough and was to return to Women at the Well when the doctor released her to return. Mother stated she was released by her doctor in March 2020. According to Mother, she tried to get back into the program at Women at the Well at that time, but they would

not accept her back due to the Covid-19 pandemic. Mother testified that she did not return to jail when she was supposed to do so. Mother acknowledged that she had been "on the run" from March 2020 until early September 2020 but stated that she was waiting for Women at the Well to take her back.

In March 2020, Petitioners filed an amended petition, adding allegations against Mother and including persistent conditions and severe child abuse against half-siblings of the Child as additional statutory grounds for termination of Mother's parental rights. Mother filed an answer to the amended petition, denying allegations regarding the additional grounds and alleging that Mother's actions did not constitute severe child abuse.

Mother had a significant vehicular accident in August 2020, wherein her car flipped multiple times. She stated that the accident was not her fault. According to Mother, she may have been speeding and a vehicle pulled out in front of her. The other driver involved in the accident, Brandi N., contradicted Mother's account of the accident, testifying during trial that Mother was driving toward her car from the opposite direction. According to the other driver, Mother was driving too fast, which caused Brandi to pull her car off the road to avoid Mother hitting her. Brandi recalled that Mother flipped her car three times and Mother's vehicle then struck Brandi's car. Mother testified that the officer on the scene learned Mother had an outstanding warrant for her arrest and that she "flipped out and ran" to avoid being arrested.

Mother had been living with her grandmother, Frankie T., from March 2020 until the accident, but following the accident, Mother testified that she "hid out" at a neighbor's house until early September when she was arrested while visiting someone at the hospital. According to Mother, she was arrested on an outstanding warrant for "leaving the scene and due care and not turning [her]self back in on [her] furlough." In September 2020, Mother was found guilty of leaving the scene of an accident and was sentenced to eleven months and twenty-nine days incarceration to be served at 50%.

The Trial Court conducted a trial over three nonconsecutive days in October, November, and December 2020. During trial, the following witnesses testified: (1) Officer Daniel Johnson, a police officer with the Sweetwater Police Department; (2) Mother; (3) Julie Sutter, a licensed clinical social worker and licensed drug and alcohol counselor; (4) Grandmother; (5) Brandi N., the other driver involved in Mother's car accident; (6) Officer Jeb Brown, former narcotics agent with the Monroe County Sheriff's Department; (7) Frankie T., the maternal great-grandmother; (8) Chris K., a half-sibling of the Child; and (9) Jennifer Blythe Mayfield, co-executive director and custodian of records for Solomon Family Solutions. The deposition of Patricia L. Scott, a licensed clinical social worker, was read into the record, as well as excerpts from Mother's deposition. Ms. Sutter and Ms. Scott testified about the Child's mental health diagnosis, his needs of stability and routine, and his relationship with Petitioners. Ms. Scott also testified regarding interactions with Mother.

Mother had been living off and on with the maternal great-grandmother, Frankie T., her whole life. According to Mother, she had received SSI benefits since 2004 due to a neck injury and had no other income prior to 2018. However, Mother also testified that in October 2018, she received $8,000 from a $10,000 settlement after a car accident in which she was a passenger in the vehicle, which was enough to pay for her attorney and her probation. According to Mother, $6,000 went to her attorney. Mother posted a photo of her holding the other $2,000 on social media.

As to her monthly expenses, Mother testified that she paid $188 for car insurance, $90 for storage units, and $150 for probation costs. Mother stated she was unsure when the probation costs began. Additionally, Mother testified that she paid off a loan from Cash Express, had paid approximately $200 per month for gas prior to her vehicular accident, and spent around $50 per month eating out mostly at McDonald's. According to Mother, she also gave her grandmother approximately $200 per month when living with her, sometimes more and sometimes less. She had paid money to her attorney, most of which came from the settlement from the car accident, but she also "had $2,000 saved up to start." Mother stated that she still owed money to her attorney.

During trial, both Mother and Grandmother testified that Mother had provided clothing, a baseball bat, and gifts for the Child's birthday and Christmas. Mother testified that she was never told to pay child support but that she would have paid it if she had been told. She stated that she tried to pay for the Child's school fees, provided the Child's teacher with school supplies she had bought for the Child, and gave the teacher $20 toward the Child's "lunch ticket so he could get some ice cream." According to Grandmother, Mother would "buy random things and drop them off." She stated that Mother did not have the list to get the correct school supplies but that she had bought "paper and stuff."

Mother testified that her visits with the Child went well until she had to take him home and he would chase her down the driveway. According to Mother, she had seen the Child in May or June 2018 at the pool in Englewood and that was the last time she had seen the Child for approximately eight months before her visits began at Solomon Family Solutions. Mother testified that after the termination petition was filed, she followed the Child home one day and handed him a note that read, "I love you and I hope to see you soon." Mother stated that her visits at Solomon Family Solutions were "wonderful" and that the Child would bring his homework to show her.

Mother acknowledged having a "history of drug problems" but stated that she was working hard "at being clean." Mother testified that she had gone to drug rehabilitation three times, twice to Buffalo Valley and once to Cadas, and that she had completed all three of them. According to Mother, she also had completed a co-parenting class at Solomon Family Solutions. When asked how long she had been clean, Mother stated: "For two years

off and on. I mean, it's a lot longer, but totally clean for two years." Mother testified to passing drug tests while incarcerated.

Mother acknowledged that it would be difficult to care for the Child now because she is incarcerated. By the last day of trial, Mother had earned trustee status at the jail and estimated her release date to be at the beginning of January 2021. Mother denied taking classes in the jail but stated that she was "doing some mental stuff" that had been provided by her counselor. According to Mother, she planned to attend The House that Mercy Built after her release from jail, which Mother described as a Christian-based program "that helps you get your life back on track" and lasts for ten to twelve months. Mother stated that she would be permitted weekly visits with her family at the program. When asked why she should be given a second chance to parent the Child and what had changed, Mother stated: "Well, I guess just time. I'm just over it now, and I just realized that this ain't the life that I want to live anymore. I've got granddaughters that look up to me and I don't want them to see that this life is an okay life to live. And my son needs to be with his mom." When asked what changed her perspective, Mother stated: "Just watching my granddaughters and just realizing that I'm getting too old for this. I'm done. It's just not fun anymore, you know. It's just – I want to be with my family and not be hanging around partying." Mother testified that she wishes to pursue her petition in juvenile court to have more visitation with the Child, and she believes the Child will be sad to not see her again.

During trial, Grandmother acknowledged that from July 2012 through April 2018, Mother had exercised her visitation with the Child. Grandmother testified that Mother had a playful relationship with the Child throughout the years, that the Child enjoyed spending time with Mother and her family, and that Mother had attended sporting events for the Child even when a restraining order was in effect. Grandmother denied that Mother called to check on the child weekly and stated that Mother would call occasionally when she had a phone. Grandmother further testified that Mother and Mother's sister had operated a house cleaning business together in 2014 or 2015.

Grandmother testified that the Child had done really well since he had been in Grandmother's home. The Child was planning to play baseball but that it had been cancelled because of Covid-19. The Child had participated in chorus and pickleball. The Child was on the basketball team at school and played baseball. He is on the "A-B Honor Roll." According to Grandmother, she has a "very loving, warm and friendly" relationship with the Child. She explained that they take care of farm animals together and do a lot of outside work. Grandmother stated that they like a lot of the same things and do a lot of things together. Grandmother testified that she and Grandfather had the financial means to care for the Child and had taken the Child to counseling when they identified any issues.

Frankie T., the Child's maternal great-grandmother, testified that Mother had stayed with her before going to Women at the Well. Mother had lived with her for periods of time throughout the years. She stated that Mother had overnight visitation with the Child at her

house, and she had supervised many visits with Mother. According to Frankie T., those visits went well. Frankie T. explained that the Child enjoyed himself during those visits, was proud to see Mother, and loved Mother. Frankie T. testified that Mother had gone to rehab "several times" to remedy her drug problem and had done well while she was staying in Knoxville as part of a program. Frankie T. further testified that Mother never used drugs in her house, that she had checked Mother's bedroom, and that she believed she would have known if Mother was under the influence of drugs. Frankie T. stated that Mother had never harmed the Child while in her presence.

Chris K., Mother's adult son, testified that he was often present when Mother visited with the Child. Chris K. testified that he had not seen the Child in a while but that Mother and the Child had "a lot of love and fun" in their relationship. Chris K. stated that Mother was "phenomenal as a mother." He testified that he stayed with Mother until he was removed from her custody when he was twelve years old. After that, he never went back into her custody. However, he testified that he continues to have a relationship with Mother. Chris K. testified that Mother had made "really unacceptable mistakes" but he believed she had learned from them and would avoid making those mistakes in the future. According to Chris K., he had seen some positive changes in his Mother and had not seen her impaired in approximately two years. Chris K. testified that Mother could be "the most influential and effective mother that anyone alive could be if that's what she chose to be" and her main desire appeared to be able to spend time with her family.

At the conclusion of trial, the Trial Court took the matter under advisement and announced its findings of fact and conclusions of law to the parties via Zoom in December 2020. In its written judgment, the Trial Court found as follows, in pertinent part:

1. That throughout the time [Petitioners] have had custody of [the Child, Mother] has been in and out of the criminal justice system.

2. That in the past [Mother] was convicted of child abuse and neglect in violation of T.C.A. 39-15-401 committed on 9-1-04 and a conviction date of 5-16-05. That at that time she had a child in the home, and under T.C.A. 37-1-102(22) and T.C.A. 36-1-113(g)(4) this is severe child abuse. She pled guilty on that same date to attempt to manufacture meth and reckless endangerment.

3. That Exhibit 1 at the hearing of this cause contains many of [Mother's] other convictions over the years, which include: theft; simple possession; possession of methamphetamine; possession of a weapon; marijuana; and shoplifting. [Mother] has had several other drug related charges; violation of probation multiple times; meth and marijuana conviction in 2019; possession of synthetic cannabinoids [o]n September 18, 2012; simple possession on July 2, 2013; DUI, 12-22-15; possession of meth 12-22-15;

- 10 -

possession of marijuana 12-22-15; theft, December 15, 2017; shoplifting 9-30-11, and, finally, 9-15-20 leaving the scene.

4. That [Mother] has failed to take a nail bed drug test as ordered by the Court even though she had agreed to do so. That [Mother] admits that she's an addict and intends to go to rehab when she is allowed out of jail; which she predicts will be by February of 2021. Her rehab that she's intending to use will last at least 12 to 18 months where she will be living at the facility. [Mother] had legal supervised visitation with [the Child] until some time in 2018. There was an allegation that [Mother] saw [the Child] at a pool in June of 2018, but the Court finds that was no more than token visitation. [Petitioners] stopped allowing [Mother] visitation through the authority granted to them in a Juvenile Court Order dated 11-2-17. [Mother] admits that she has been unable to care for [the Child] and will continue to be unable to parent the child for at least another year.

5. As to the ground of severe child abuse, [Mother] denies knowingly having a child in the home where meth was being manufactured. However, the officer testified the place had a strong smell of chemicals and meth. The components were not hidden but the children were not there at the time. The Court doesn't find that the law requires them to be there at the time the arrest is made. [Mother] admits living at that place with her children while meth was not there, just the smell of meth and the components were there at the time the officers were there. The Court didn't find [Mother's] version of that day to be credible that she didn't know that meth was being made there. The child doesn't have to be present while making the meth takes place. In re: Meagan E. (2006) 10 at Lexis 350. "Because the ingredients themselves to make meth are dangerous." The Court found [Mother's] recitation of the facts about being in the trailer that she and the children shared with [Ian L.] not to be credible. [Mother] admits the children were there when [Ian L.] was arrested on federal drug charges, and the Court therefore finds by clear and convincing evidence that pursuant to T.C.A. 37-1-102(22) and T.C.A. 36-1-113(g)(4) that [Mother] committed severe child abuse.

6. On the issue of persistent conditions, it is clear that [the Child] has been out of [Mother's] home for more than six months. The conditions that led to [the Child's] removal persist and in all probability would cause the child to be subjected to abuse or neglect if the child returned to [Mother's] home pursuant to T.C.A. 36-1-113(g)(3), and, therefore, the Court finds by clear and convincing evidence that these conditions prevent the child's safe return to [Mother] at this time and at the time the lawsuit was filed. There is little likelihood that these conditions will be remedied. [Mother] has been in and out of rehab over the last nine years when the [Child] was found to be

- 11 -

dependent and neglected. The child has been allowed to visit with [Mother] but these have failed to be continuously successful. [Mother] lost custody of two other children and never got them back because of her drug use. [Mother] agreed to and then refused to submit to Nail Bed Drug Tests.

7. The petitioners also filed on the issue of abandonment, and failure to visit. The Court finds that the Petitioners failed to prove [Mother] failed to visit in the four (4) months preceding the filing of the Petition in July, 2018, and therefore it was not established by clear and convincing evidence that [Mother] did not visit with [the Child].

8. With regard to failure to support, [Mother] alleged she was on SSI and that the child support guidelines do not call for her to pay child support out of those funds. [Mother] was shown on Facebook to have a large amount of cash in October of some year, when she went to jail, but she went to jail several times so the Court was unable to pin down the exact date. [Mother] also received $10,000 in proceeds from a personal injury action and paid no child support. [Mother] also had some odd jobs that she worked and paid no child support. [Mother] also was able to purchase drugs and paid no child support. When the allegation of failure to pay child support is pled, [Mother] has the burden to prove that her failure to pay was not willful, just proving that she was drawing SSI at some point in time is not enough to prove that her failure to pay child support was not willful. The Court finds that this ground has been proven by clear and convincing evidence. That [Mother] has had enough – she has had money over various periods of time and has paid nothing. Giving gifts to the school or small gifts to the child is not the same as paying child support. [Mother's] testimony was impeached in several places. This Court does not find her credible about her income or knowledge about that meth in her home.

9. [Mother] admits [Petitioners] take good care of [the Child]. The counselor testified [Petitioners] are seeing to his needs and that to return the child to the care and custody of [Mother] is not in his best interest. [Petitioners] have provided food, clothing, and shelter, for the past nine years for this child. [The Child] deserves permanency. The Court finds based on the foregoing that [Petitioners] have established by clear and convincing evidence that the Court has grounds for terminating the parental rights of [Mother] to [the Child].

In addition, the Court finds the following with regard to the best interest of [the Child]: under T.C.A. 36-1-113(i) whether a parent or guardian has made an adjustment of circumstances to make it safe for the child's best interest to be in the home of that parent or the guardian of the child in this situation, the

Court finds that [Petitioners] have. That was bolstered not only from their own testimony but the testimony of the counselor. [Mother] has failed to make a lasting adjustment after reasonable efforts to get off drugs. [Mother] has attempted rehab on several occasions and each of those have failed. [Mother] has failed to make a lasting adjustment and that adjustment does not appear to be reasonably possible in the future. [Mother] did not maintain regular visitation or contact with the child. There is a meaningful relationship between the child and [Petitioners] and to disturb that relationship would not be in the child's best interest. The counselor testified that it would be harmful to [the Child's] emotional and psychological condition to return the child to [Mother] or to sever the ties between the child and [Petitioners]. [Mother] has shown abuse or neglect towards other children that were in her household and the current custodial family ([Petitioners]) have not. [Petitioners] are providing a healthy and safe atmosphere for [the Child]. The Court found that [Mother's] current emotional and mental status would be detrimental to [the Child] and would prevent her from effectively providing safe and stable care and supervision of the child. [Mother] still plans to do another 12 to 18 months of rehab and is not able to parent this child at this time. All of that is supported by clear and convincing evidence, and to return [the Child] to [Mother] would pose a risk of substantial harm to the welfare of the child. The Court does recognize that [Mother] does want to be a parent and is not agreeing to this voluntarily and that she loves her child very much and wants to be able to parent the child but it is, and has been, nine years and [Mother] has not been able to successfully parent [the Child] and for that, among all the other reasons, the Court finds that it is in the [Child's] best interest to terminate [Mother's] rights.

(Paragraphs renumbered.) Mother timely appealed to this Court.

## Discussion

Although not stated exactly as such, Mother raises the following issues for our review on appeal: (1) whether the Trial Court erred in finding by clear and convincing evidence the statutory grounds of severe child abuse, persistent conditions, and abandonment by failure to financially support the Child and (2) whether the Trial Court erred in finding by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[1] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference

---

[1] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[2] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[3] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care

---

[2] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[3] Tenn. Code Ann. § 36-1-113(i).

- 15 -

and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

## B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in

- 16 -

parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In combination with a best interest finding, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Additionally, the Trial Court is the arbiter of witness credibility of those who testify live before it. As our Supreme Court has instructed:

When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, ⎯ U.S. ⎯⎯, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014).

We first address Mother's issue concerning the ground of severe child abuse. Tennessee Code Annotated § 36-1-113(g)(4) provides as a ground for termination of parental rights if the parent has committed severe child abuse against any child. Pursuant to the statute, this ground may be proven either by admitting into evidence a prior court order finding the parent has committed severe child abuse or by the trial court hearing evidence during the termination trial and finding by clear and convincing evidence that the parent has committed severe child abuse, as defined in section 37-1-102. *See* Tenn. Code Ann. § 36-1-113(g)(4) (2021). Tennessee Code Annotated § 37-1-102(27)(D) (Supp. 2021) defines severe abuse as follows in relevant part: "Knowingly allowing a child to be present within a structure where the act of creating methamphetamine, as that substance is identified in § 39-17-408(d)(2), is occurring."

On appeal, Mother argues that the evidence presented at trial regarding the 2004 incident was insufficient to support a finding by clear and convincing evidence that Mother committed severe child abuse against the Child's half-siblings. According to Mother, Officer Brown's testimony about this incident was vague and not specific to this incident. However, Officer Brown acknowledged during trial that he had detected *on this occasion* an odor indicating that methamphetamine had been manufactured in the home. Officer Brown then went on to explain the difference between the manufacture of meth from 2004 that resulted in a chemical smell and how it is made now. When asked to clarify his testimony, Officer Brown testified that he had detected "a very strong smell" there. He further testified that components to make methamphetamine were found within the home and were not hidden. We disagree with Mother's argument that Officer Brown's testimony concerning the incident was too vague. The Trial Court appeared to credit Officer Brown's testimony concerning the chemical smell in the home, as well as the presence of components in the home.

In her brief, Mother takes issue with the Trial Court's decision to discount Mother's testimony on the issue of severe abuse. In its order, the Trial Court acknowledged that Mother denied knowingly having the children in the home where methamphetamine was being manufactured. However, the Trial Court specifically found that Mother's testimony regarding her version of events surrounding this incident to not be credible. Specifically, the Trial Court found to not be credible Mother's testimony that she did not know that methamphetamine was being manufactured in the home. A trial court's determination regarding witness credibility is given considerable deference and will not be overturned on appeal unless there is clear and convincing evidence to the contrary. *Kelly*, 445 S.W.3d at 692-93. We find no clear and convincing evidence to contradict the Trial Court's finding regarding Mother's credibility.

In making its decision, the Trial Court cites to this Court's opinion in *In re Meagan E.*, No. E2005-02440-COA-R3-PT, 2006 WL 1473917, at *4 (Tenn. Ct. App. May 30, 2006), wherein a parent essentially argued there was insufficient proof that the parent allowed the child to be present within the home while "a 'cook' was actually occurring." The parent did not contest that the child was in the home while ingredients to manufacture methamphetamine were present, only that they were not present during an active "cook." *Id.* This Court rejected the parent's "narrow interpretation" of the severe child abuse statute and held that it was immaterial whether the child was actually present during the active "cook" of methamphetamine. *Id.* at *4. This Court held that the parent's interpretation ignored that the severe abuse provision at issue was clearly designed to protect children from being in structures were meth labs were present. *Id.* at *5. This Court in *In re Meagan E.*, recognized that the harmful effects that result from the manufacture of methamphetamine linger long after the "cook" has been completed and that many of the chemicals used in the production of methamphetamine are "highly poisonous" and "highly flammable." *Id.*

Mother states in her brief that this Court's holding in *In re Meagan E.* appears to contradict the severe child abuse statute requiring the child to be present in the home where the act of manufacturing methamphetamine "is occurring." We disagree with Mother's argument in this regard. A lack of evidence that a child was physically present during the actual "cook" of methamphetamine does not preclude the court from finding a parent committed severe abuse if other evidence exists demonstrating that the child had been present in the home where the manufacturing of methamphetamine was occurring. This Court in *In re Meagan E.*, acknowledged that the components to make methamphetamine can be poisonous and highly flammable and that the harmful effects of creating methamphetamine can linger for long periods of time, both of which can be dangerous to children who are present within a structure containing a meth lab, even if an active cook is not taking place. Based upon this Court's opinion in *In re Meagan E.*, the Trial Court found that the Child did not have to be in the home while the actual act of making the methamphetamine was happening. Based on the evidence before the Trial Court, we find no error with the Trial Court's finding in this regard.

During trial, Mother admitted that in 2004, her children were living in the home with her and Ian L. and that the police found a meth lab in the home. Components were present and within plain view within her home and a chemical smell lingered from the manufacture of methamphetamine. Although Mother denied that she knew a meth lab was present within the home, the Trial Court found Mother's testimony in this regard not to be credible, and the evidence in the record does not preponderate against the Trial Court's credibility determination in this regard. Officer Brown testified that when Mother arrived at the home when law enforcement was present, she chose to leave instead of going into her home and that they had to go after her. Furthermore, Mother subsequently pled guilty to one count of attempting to manufacture methamphetamine, one count of reckless endangerment, and two counts of child abuse and neglect related to this incident. Based upon the evidence presented and the Trial Court's determination that Mother was not credible, we find and hold, as did the Trial Court, that Petitioners proved by clear and convincing evidence that Mother had severely abused the Child's half-siblings in 2004. We, therefore affirm this ground for the termination of Mother's parental rights.

We next address whether the Trial Court erred by finding the ground of persistent conditions against Mother. As to persistence of conditions, Tennessee Code Annotated § 36-1-113(g)(3) provides as follows:

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian,

- 19 -

or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Mother argues on appeal that the Trial Court erred by failing to make a finding regarding subsection (iii). The Trial Court made several findings as relevant to this statutory ground, including that the Child had been removed from Mother for a period of more than six months, that the conditions that led to the Child's removal from Mother continued to persist, and that there was little likelihood that those condition would be remedied. However, Mother is correct that the Trial Court did not address subsection (iii) and make specific findings of fact regarding whether the continuation of the parent/child relationship between Mother and the Child would greatly diminish the Child's chances of early integration into a safe, stable, and permanent home.

In a recent case, this Court vacated the ground of persistent conditions for the same reason. In that case, this Court stated as follows:

While the Juvenile Court's order in this case contains limited findings responsive to this ground, notably, it contains no findings relative to (g)(3)(A)(iii) concerning whether "[t]he continuation of the parent ... and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home." Being an element of the statutory ground, it is a factor that must be established and found. Indeed, "[t]he absence of appropriate findings supporting this ground for termination is not a trivial concern." *In re Mickeal Z.*, No. E2018-01069-COA-R3-PT, 2019 WL 337038, at *13 (Tenn. Ct. App. Jan. 25, 2019). In termination cases, "the trial court is specifically directed by statute to 'enter an order that makes specific findings of fact and conclusions of law.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(k)). Because the Juvenile Court did not make findings regarding each of the elements applicable to the persistence of conditions ground, we hereby vacate the termination order with respect to this ground.

*In re Dominic B.*, No. E2020-01102-COA-R3-PT, 2021 WL 774185, at *8 (Tenn. Ct. App. Mar. 1, 2021). Similarly, we vacate the ground of persistent conditions as a ground for termination of Mother's parental rights due to insufficient findings of fact concerning Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii) as required by Tennessee Code Annotated § 36-1-113(k).

We next address Mother's issue concerning the statutory ground of abandonment by failure to support. Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2019) provides abandonment by a parent as a ground for the termination of parental rights. We note that the termination petition was filed in July 2018 and that the relevant statute in effect at that time defining abandonment stated as follows in pertinent part:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A) (2021). Tennessee Code Annotated § 36-1-102(1)(D) requires that a parent provide more than token payments toward the Child's financial support. Tennessee Code Annotated § 36-1-102(1)(B) defines "token support" as support that, under the circumstances of the particular case, "is insignificant given the parent's means." Furthermore, "[t]hat the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period." Tenn. Code Ann. § 36-1-102(1)(D) (2021). The relevant statute in effect at the time the petition was filed removed the word "willful" from the definition of abandonment and instead provided as an affirmative defense that the parent's failure to visit or support was not willful. *See* Tenn. Code Ann. § 36-1-102(1)(I). To prove this defense, a parent must establish his or her lack of willfulness by a preponderance of the evidence. *Id.*

On appeal, Mother raises as an issue concerning whether the Trial Court erred by finding by clear and convincing evidence that she abandoned the Child by failing to financially support him. The Trial Court found that Mother had failed to pay any child support for the Child's benefit during the four months prior to the termination petition's filing in July 2018. On appeal, Mother does not appear to contest the Trial Court's finding

- 21 -

that she paid no support, only whether that lack of support was willful. In fact, when asked whether she paid child support for the Child during the four months preceding the filing of the petition, Mother stated that she "wasn't told to" but that she would have paid support if she had been told to pay. However, the absence of a court order requiring a parent to pay child support does not negate that parent's obligation to pay support. *See In re M.A.C.*, No. M2007-01981-COA-R3-PT, 2008 WL 2787763, at *5 (Tenn. Ct. App. July 17, 2008) ("Though Mother was not under a court order setting support for her children, such an order is not required."). Furthermore, Tennessee Code Annotated § 36-1-102(1)(H) provides that every parent eighteen years old or above is presumed to have knowledge of the legal obligation to financially support his or her children.

In her brief, Mother argues that "the trial court's finding that [Mother] was capable of supporting [t]he child and that her failure to support her son during the relevant period was therefore 'willful' is clearly NOT supported by convincing evidence on the facts in this record." In her brief, Mother cites to the former version of the statute in effect prior to July 2018, wherein the petitioner was required to prove that a parent's failure to support a child was willful. However, the General Assembly amended the statute on July 1, 2018, removing the words 'willful' from the text of the statute and instead making it an affirmative defense that the parent's failure to support was not willful. In doing so, the burden of proof was shifted to Mother to prove by a preponderance of the evidence that her failure to financially support the Child was not willful. Mother incorrectly argues in her brief that "[i]t was the Appellees' [i.e. Petitioners'] burden to present evidence sufficient to eliminate any serious or substantial doubt about whether this mother's failure to support was willful." This is simply not true after the 2018 amendments to the statutory definition of abandonment.

Tennessee Code Annotated § 36-1-102(1)(D) requires that a parent provide more than token payments toward the Child's financial support. We recognize that Mother had given the Child items of clothing, a baseball bat, Christmas gifts, and birthday gifts, as well as providing some school supplies to the Child's school. However, the Trial Court found that providing school supplies to the school or small gifts to the Child was not the same as paying child support for the Child.

Mother argues that Petitioners had not presented any evidence to contradict Mother's testimony that she only received "a very meager SSI stipend" since 2004. However, after observing Mother's testimony, the Trial Court found that Mother's testimony concerning her income was not credible and had been impeached many times. Upon our review of the record, there is not clear and convincing evidence contrary to this credibility determination by the Trial Court, and we must afford considerable deference to the Trial Court's determination in this regard. *See Kelly*, 445 S.W.3d at 692-93. Additionally, concerning child support and SSI benefits, this Court recently stated as follows:

It is well settled in Tennessee that SSI benefits are not subject to legal process for payment of court-ordered child support. *See Tenn. Dep't of Human Servs., ex rel. Young v. Young*, 802 S.W.2d 594, 599 (Tenn. 1990). However, this Court has considered a parent's disability benefits in the context of parental rights termination to find that a parent could have provided some amount of support for his child. *See, e.g., In re Miracle M.*, No. W2017-00068-COA-R3-PT, 2017 WL 3836020, at *6 (Tenn. Ct. App. Aug. 30, 2017) (affirming the trial court's finding that the father "could have paid some amount of support" when he received "income of at least $735.00 per month" in disability benefits and had "income sufficient to support his [smoking] habit").

*In re Kierani C.*, No. W2020-00850-COA-R3-PT, 2021 WL 4057222, at *12 (Tenn. Ct. App. Sept. 3, 2021). In *Kierani C.*, this Court affirmed the ground of abandonment by failure to pay child support when the father was receiving SSI benefits but also had received income from other sources. *Id.* at *13-14.

Similar to *Kierani C.*, the Trial Court in this case found that Mother had received other income aside from the SSI benefits. The Trial Court found that Mother had worked some odd jobs, which was supported by Grandmother's testimony that Mother and her sister had a house cleaning business they started together. The Trial Court further found that Mother had money over periods of time throughout the case, had purchased drugs, and had not paid any child support for the Child. Mother received a settlement from a vehicular accident, but Mother testified that she had not received it until a few months after the petition had been filed and that it had been used to pay for her attorney's fees and probation costs. Mother testified that the majority of the money she paid to her attorney had come from a settlement she had received a few months after the petition was filed but that she also "had $2,000 saved up to start." We also note Mother's own testimony that she would have paid support if she had been told to pay which is at least a tacit acknowledgement that she had the ability to pay some amount of support.

Despite Mother's argument to the contrary, the burden was on her to prove by a preponderance of the evidence that her failure to provide financial support for the Child was not willful. *See* Tenn. Code Ann. § 36-1-102(1)(I) (2021). The Trial Court found that she had not met this burden. Based on the foregoing, we agree. We, therefore, affirm the Trial Court's finding by clear and convincing evidence that Mother had failed to financially support the Child during the four months prior to the filing of the petition.

Finally, having determined that grounds exist for the termination of Mother's parental rights, we next address her argument concerning the best interest analysis. Mother argues that the Trial Court erred in finding by clear and convincing evidence that termination of her parental rights was in the Child's best interest. Tennessee Code

Annotated § 36-1-113(i) provides a set of non-exclusive factors courts are to consider in determining whether termination of parental rights is in a child's best interest:

(i)    In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1)    Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)    Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)    Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)    Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)    The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)    Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)    Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)    Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2020).

With regard to making a determination concerning a child's best interest, our Supreme Court has instructed:

> When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re*

- 25 -

*Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its best interest analysis, the Trial Court considered each of the enumerated factors in Tennessee Code Annotated § 36-1-113(i). Mother mentions in her brief that the Trial Court incorrectly applied factor (1) to Petitioners and whether they had provided a safe home for the Child. We agree that factor (1) generally applies to the progress made by the parent or guardian whose rights at issue; however, the remaining factors, without consideration of factor (1), weigh heavily in favor of termination of Mother's parental rights.

Mother argues on appeal that the Trial Court failed to consider the most important factors in its best interest analysis. We disagree. Although Mother had visited the Child consistently throughout most of the case, there were extended periods of time where she had not visited. Mother argues that she was prevented from visiting with the Child "due to circumstances beyond her control," including drug relapses and her inability to pay for the nail bed drug test. After the juvenile court's order in October 2017, Petitioners had the discretion to stop visitation with Mother if it was in the Child's best interest. Although testifying during trial that she had no notice of the hearing, she acknowledged that she had not filed anything with the juvenile court to modify that order. According to Mother, she had gone eight months without seeing the Child during that time. After December 2018, Mother was allowed supervised visits with the Child at Solomon Family Solutions. However, in April 2019 following a subsequent arrest, the Trial Court temporarily stopped all visits until Mother provided a negative nail bed drug test to the Trial Court. Mother never obtained the required nail bed drug test and had no further visits with the Child. Although Mother argues that she was unable to afford the drug screen, she testified to receiving $8,000 from a $10,000 settlement just six months prior. At the time of trial, Mother had not visited with the Child since April 2019, which had been over six months on the final day of trial. Mother argues that she was prohibited from visiting with the Child; however, Mother could have remedied the issue that was preventing her visitation by ceasing her drug use and other criminal conduct and by obtaining the nail bed drug screen. Instead, Mother failed to comply with the Trial Court's order and never regained her visitation.

Mother also argues that the Trial Court erred by finding that the counselor had testified that it would be harmful to the Child if he was returned to Mother's custody or the

ties were severed between the Child and Petitioners. According to Mother, a hypothetical posed to Ms. Sutter was objected to and sustained by the Trial Court. However, two mental health providers had testified for the purposes of this proceeding, Ms. Sutter and Ms. Scott. Ms. Scott, a licensed clinical social worker, had treated the Child for anxiety and oppositional behavior. When Ms. Scott was treating the Child, she had reservations regarding whether Mother could provide a safe home for the Child. Although the Child had not been treated by Ms. Scott for a few years by the time of the deposition, Ms. Scott opined that if Mother had continued her criminal activity and drug use, it would be in the Child's best interest to remain in Petitioners' home. Ms. Scott explained that the Child needs stability, security, support, and nurturing. Ms. Scott further opined that the Child was safe and more stable at Grandmother's home. Ms. Sutter, a licensed clinical social worker and drug and alcohol counselor, also testified to the "warm, connected relationship" the Child had with Grandmother and that the Child's behaviors had improved during the time she treated him. Ms. Sutter testified that the Child needed consistency and structure in his daily life. This testimony by the mental health professionals supports the Trial Court's finding that it was not in the best interest to disturb the relationship between the Child and Petitioners. Furthermore, although Mother argues that the Trial Court had not considered Petitioners' ages and overall health, Ms. Scott testified that Petitioners were in good health when she treated the Child and had provided well for the Child. Grandmother also testified that she was in good health at the time of trial.

In her brief, Mother acknowledged that she was not in a position to assume custody of the Child at the time of trial; however, she stated that the Child would benefit from continuation of his relationship with Mother. Mother appears to argue in her brief that there should be no urgency or exigency to conclude the pending termination case because the Child is not in foster care. We commend Mother, as did the Trial Court, for her desire to be a parent and her love for the Child. However, the fact that this Child is not in foster care does not negate the need for permanency and a stable home, as indicated by the Child's mental health providers. Mother had nearly nine years that the Child had been in Petitioners' custody for her to get into a position to be a parent to the Child. Instead, Mother continued to abuse drugs and participate in criminal activity.

Furthermore, Mother admittedly spent her time from March through September 2020 "on the run" for failing to return to jail after her furlough ended, during which time the termination petition was pending. While "on the run," Mother was involved in a vehicular accident in August 2020 and incurred a new charge stemming from her action of fleeing the scene of the accident to avoid being arrested on an outstanding warrant. She then admittedly "hid out" at a neighbor's house until she was arrested in early September 2020, approximately one month prior to trial. Mother was incarcerated at the time of trial. Even after her release, Mother planned to attend a Christian-based program following her release from jail that would last ten or twelve months. According to Mother, that program allows family visitors only once a week. As the Trial Court found, Mother, at best, would be unavailable to parent the Child for several months after she is released from jail. We

- 27 -

find and hold by clear and convincing evidence, as did the Trial Court, that termination of Mother's parental rights is in the Child's best interest.

## **Conclusion**

The judgment of the Trial Court terminating the parental rights of Misty K. is affirmed as modified, and this cause is remanded to the Trial Court for collection of the costs assessed below. The costs on appeal are assessed against the appellant, Misty K., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE